UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN MARCHISOTTO,                              :
                                               :
                         Plaintiff,            :
                                               :          MEMORANDUM
            - against -                        :        OPINION & ORDER
                                               :        05 Civ. 2699 (RLE)
THE CITY OF NEW YORK, et al.,                  :
                                               :
                         Defendants.           :

RONALD L. ELLIS, United States Magistrate Judge:

## I.  INTRODUCTION

On March 29, 2005, plaintiff, John Marchisotto ("Marchisotto"), filed suit in the

Southern District of New York, naming the New York Police Department[1], the City of New York

("the City") and Carla Hollywood ("Hollywood") as defendants.  Marchisotto claimed that

Hollywood, who was his supervisor at the time, had sexually harassed him, and that he had been

retaliated against by Hollywood and the City when he complained about the harassment, both in

violation of Title VII.[2]  On July 25, 2006, the parties consented to jurisdiction by the

undersigned.  Trial commenced on January 22, 2007.  At the close of plaintiff's evidence, the

Court denied a motion by the City and Marchisotto for a directed verdict pursuant to Federal

Rule of Civil Procedure ("FRCP") 50.  The jury found for defendants on the harassment claim,

but returned a verdict for Marchisotto of $300,000 in compensatory damages for the retaliation

---

[1] The New York Police Department is not a suable entity.  *See* **Jolly v. New York City Dep't of Corr.**, 1989 WL 153053, at *4 (S.D.N.Y. Dec. 13, 1989) (*citing* **Martin v. City of New York**, 627 F. Supp. 892, 894 n. 2 (E.D.N.Y. 1985)).

[2] Although Marchisotto filed claims under both Title VII and the New York Human Rights Law, New York courts follow federal law when adjudicating claims under the state human rights law.  Therefore, both the Title VII claim and the state law claim are analyzed together as the "Title VII claim" in this opinion.  *See* **Tyler v. Bethlehem Steel Corp.**, 958 F.3d 1176, 1180 (2d Cir. 1992).

claim.

On February 1, 2007, the City and Hollywood renewed their motion for judgment as a matter of law pursuant to FRCP 50(b), seeking to set aside the verdict finding retaliation. They also seek a new trial on the retaliation charge, or on damages alone, under FRCP 59(a), or in the alternative, for remittitur pursuant to FRCP 59(e) to reduce the jury verdict. Defendants' Memorandum of Law in Support of their Motion for Dismissal of Plaintiff's Retaliation Claim, or for a New Trial on Plaintiff's Claim of Retaliation, and/or a New Trial on Damages, or in the Alternative to Reduce the Jury's Award ("Def. Mem."), at 3-4, 9. Marchisotto filed a response on February 8, 2007. Plaintiff's Memorandum of Law in Opposition to Defendants' February 1, 2007 Post-Trial Motions ("Pl. Mem."). For the following reasons, the City and Hollywood's motion is **DENIED**.

## II. FACTS

Marchisotto, a retired member of the New York Police Department ("NYPD"), was previously a sergeant stationed at the Staten Island Housing Unit ("Housing Unit"). Trial Transcript ("Tr.") at 26-27. Hollywood is also retired from the NYPD, where she was previously a lieutenant. **Id**. at 270. In October 2003, she was assigned to the Housing Unit and became Marchisotto's immediate supervisor. **Id**. at 31. Marchisotto testified that Hollywood immediately began acting in a manner he found to be inappropriate, and which made him uncomfortable. **Id**. at 31-32. He claimed that Hollywood asked him if he was married and, when he replied in the affirmative, whether he was happily married. **Id**. Marchisotto alleged that Hollywood asked him what he did when he wasn't with his wife, and then brushed her breasts against his back. **Id**. at 32. Marchisotto testified that, over the next several months, Hollywood

2

would call him up to six times a day, telling him that she just wanted to hear his voice and see if

he was there.  **Id**. at 33-34.  According to Marchisotto's testimony, his rejection of Hollywood's

actions led her to start criticizing him.  **Id**. at 36-39.  First, Hollywood challenged Marchisotto

because he left his post at the Housing Unit during his tour of duty, which Marchisotto testified

was standard practice.  **Id**. at 36, 278.  Second, in her performance review of Marchisotto,

Hollywood rated his abilities as low in the areas of "evaluating personnel and . . . adaptability."

**Id**. at 39-40, 289.  In response to his evaluation by Hollywood, on February 5, 2004, Marchisotto

wrote a letter to Chief Jaffe, the head of the housing bureau, complaining about abuse of

authority and inappropriate behavior, but not specifically mentioning sexual harassment.[3]  **Id**. at

41.

On February 12, Marchisotto alleged that Hollywood approached him at the Housing Unit

and, after asking if he was there alone, started to massage his neck.  **Id**. at 43.  Marchisotto

testified that Hollywood said that his evaluation "didn't have to go that way," and that she could

"still make it right."  **Id**.  Marchisotto testified that Hollywood then took out a bottle of pink

lotion, told him that she was "going to have a great time on Valentine's day," and asked if he

would like to try some of the lotion.  **Id**. at 44.  According to Marchisotto, he declined, stating

that he was "happily married," and Hollywood "stormed out . . . in a rage."  **Id**.  Marchisotto

testified that on February 13, he gave Captain Gutch a videotape which showed Hollywood

storming out in a fit of rage.  **Id**. at 45.

On February 17, a lieutenant, a sergeant, and a detective from the local precinct came to

---

[3]At trial, Marchisotto testified that he had sent two versions of this letter to Chief Jaffe, one on February 5 and one on February 9.  According to his testimony, the letters were nearly identical, with the second letter having corrected spelling errors and some additional information about the alleged inappropriate behavior.

Marchisotto's home, removed his firearms, and brought him to the precinct. **Id**. at 49-52.  At the precinct, Marchisotto was informed that he was being ordered to report to the police department's psychological services unit the following day, which he did.  **Id**. at 52-53.  On February 25, Marchisotto sent a letter to Commissioner Ray Kelly complaining about "retaliation, misconduct, abuse of authority, sexual harassment, intimidating, hostile work environment, and false statements."  **Id**. at 55.  On March 2, Marchisotto was informed that he was being transferred out of the Housing Unit, and reassigned to the "81 Jersey Street record room."  **Id**. at 57.  Marchisotto was given a key to the record room, but not told what his assignment was, or what he should do in the record room.  **Id**. at 60.  In his testimony, he described the record room as looking like a "storage closet," with "filthy, disgusting" couches and police barriers in it.  **Id**.  There was no computer in the record room, but there was a blank, unlabeled command log.  **Id**. at 64.  On his first day in the record room, Marchisotto went to the hospital because he was experiencing claustrophobia, rapid heartbeat, and difficulty breathing.  **Id**. at 65.  On March 3, Marchisotto wrote another letter to Commissioner Kelly complaining about the transfer, and alleging that it was retaliation.  **Id**. at 67-68.  Marchisotto returned to work at the record room two weeks later, and worked in the record room until August 23, 2005, when he retired.  **Id**. at 67, 69.  During that time, Marchisotto was the only employee assigned to the record room.  **Id**. at 70.  He neither relieved any officer when he came to work, nor was he relieved by an officer when his shift was over.  **Id**.  When Marchisotto was out for approximately two to three months because of surgery, no other officer covered his assignment.  **Id**. at 71.  He was never given any responsibilities or job duties to perform, and eventually retired due to an injury unrelated to this lawsuit.  **Id**. at 70-71.

Marchisotto described feeling depressed, demeaned, and humiliated as a result of his transfer. **Id**. at 78. In December 2004, Marchisotto started seeing a psychiatrist and a psychologist. **Id**. at 79-82. The psychiatrist prescribed Marchisotto medications to treat anxiety, depression, and an inability to sleep. **Id**. at 80. Marchisotto changed doctors, but was continuing to receive medical treatment at the time of his testimony at trial. **Id**. at 80-81. His treating psychiatrist, Dr. Robert Conciatori ("Dr. Conciatori"), testified that Marchisotto suffers from panic disorder, posttraumatic stress disorder, and major depressive disorder. **Id**. at 226. Marchisotto's symptoms include flashbacks, problems sleeping, anxiety, humiliation, difficulty performing sexually, and significant distress. **Id**. at 228-30. Dr. Conciatori described Marchisotto as too "shattered" to return to his job as a police officer, and still suffering the loss of his career. **Id**. at 230.

Marchisotto's treating psychologist, Dr. Claude Pompo ("Dr. Pompo"), testified that when he first started treating Marchisotto in December 2004, he was "under a lot of psychological distress" and appeared "very depressed." **Id**. at 247. Marchisotto was exhibiting symptoms such as sadness, apathy, lack of concentration, changes in appetite, and difficulty sleeping. **Id**. During the time he was assigned to the record room, Marchisotto had a "considerable amount of anxiety and distress," and Dr. Pompo testified that he had been concerned about Marchisotto "being in that place, isolated from others." **Id**. at 254. He believed that Marchisotto had been suffering from posttraumatic stress disorder as a result of his assignment to the record room, which led to a major depressive disorder. **Id**. at 257. While Marchisotto's depression has improved somewhat, "he still manifests considerable signs of posttraumatic stress [dis]order that is impeding his ability to move on with his life." **Id**.

Marchisotto ruminates over "the thoughts, feelings, sensations and images recorded and associated with the trauma," and needs guidance because "other parts of his life are taking somewhat of a secondary role" at the present time.  **Id**. at 258.

At trial, Captain Richard Gutch claimed that he first learned of Marchisotto's complaints about sexual harassment on March 30, subsequent to Marchisotto's transfer to the record room. **Id**. at 135, 190.  However, he testified that Hollywood reported to him that Marchisotto tape recorded a conversation with her, and that "everyone knew" about this and it "became common knowledge in the command" through word-of-mouth.  **Id**. at 167-69.  Captain Gutch also testified that he was made aware of Marchisotto allegedly making threats and wearing a bullet proof vest inside the Housing Unit, even though he had no personal knowledge of any of these alleged events.  **Id**. at 202.  Hollywood also testified that the first time she heard that Marchisotto was alleging sexual harassment and retaliation was in late March 2004, and that she had not seen the letter written on February 25, 2004, which was sent to Commissioner Kelly and copied to four other people within the NYPD.  **Id**. at 300.  Yet, Hollywood admitted at least four instances in which she was informed by word-of-mouth that Marchisotto was going to make a complaint about her, even though he never made formal, written complaints.  **Id**. at 300-02, 304-05. Hollywood testified that, prior to the removal of Marchisotto's firearms on February 17, she had been made aware that Marchisotto was allegedly making threats against her and acting "erratically," even though she did not personally witness either the threats or behavior.  **Id**. at 295.  In addition, Hollywood testified that she learned of statements Marchisotto had allegedly made, blaming her for a command discipline issued by another lieutenant.  **Id**. at 298.

Captain Gutch testified that he assigned Marchisotto to the record room because

Marchisotto "wasn't getting along with subordinates . . . [or] supervisors," and his options in terms of moving him were limited because Marchisotto was on restricted duty. **Id**. at 191, 195. Captain Gutch claimed that the position in the record room was a "supervisory assignment," and that Marchisotto's responsibility there was "to ensure that the record room was not being used inappropriately." **Id**. at 195, 144.

## III.  DISCUSSION

### A.     FRCP 50(b) Motion to Set Aside Verdict Finding Retaliation

The City and Hollywood first move to overturn the jury's verdict pursuant to FRCP 50(b).  They argue that the jury's verdict was rendered against the weight of the evidence. Judgment as a matter of law may only be granted where there is a complete absence of evidence supporting the jury's verdict, or if the evidence in favor of the moving party is so overwhelming that no reasonable person could arrive at a verdict against it.  **Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.**, 136 F.3d 276, 289 (2d Cir. 1998); **Luciano v. Olsten Corp.**, 110 F.3d 210, 214 (2d Cir. 1997); **Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec. Workers**, 34 F.3d 1148, 1154 (2d Cir. 1994).  In assessing the record, the Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of that party.  **Galdieri-Ambrosini**, 136 F.3d at 289; **Vasbinder v. Ambach**, 926 F.2d 1333, 1339 (2d Cir. 1991).  Further, the Court may not weigh the testimony of the witnesses, but must defer to the jury's credibility determinations.  **Galdieri-Ambrosini**, 136 F.3d at 289; **Vasbinder**, 926 F.2d at 1339.  *See* **Maldonado v. Candidus**, 2000 WL 1473606, at *2 (S.D.N.Y. Oct. 4, 2000). Under this standard, the City and Hollywood's motion for judgment as a matter of law must be denied.

The City and Hollywood assert three grounds in support of their motion for judgment as a matter of law.  First, they claim that, based on the evidence presented at trial, no reasonable jury could have found that Marchisotto had a good faith basis to complain about sexual harassment. Def. Mem. at 5.  Second, they assert that the jury did not follow the instructions contained on the verdict sheet.  According to the City and Hollywood, this failure raises such serious doubts about the jury's understanding of and ability to follow the Court's verbal instructions that the verdict on retaliation must be set aside.  **Id**.  Third, the City and Hollywood argue that, because the jury found no *quid pro quo* sexual harassment, they are entitled to judgment as a matter of law on the retaliation claim.  **Id**.  They claim that, by finding against Marchisotto on the sexual harassment claim, the jury found "in favor of Hollywood," proving that the allegation of sexually harassing behavior "simply did not happen."  **Id**.  Without a finding that *quid pro quo* sexual harassment occurred, the City and Hollywood argue that a jury could not have reasonably concluded that Marchisotto had a good faith basis to complain, and, therefore, they are entitled to a judgment in their favor on the retaliation claim.  **Id**.

Marchisotto claims that his complaint was based on his perception that he was being subjected to sexually harassing conduct, and asserts that the evidence introduced at trial supports his good-faith belief that Hollywood's actions violated Title VII.  Pl. Mem. at 3.  Marchisotto asserts that the City and Hollywood misstate the law with their claim that a finding against Marchisotto on the *quid pro quo* sexual harassment claim entitled them to judgment as a matter of law on the retaliation claim.  **Id**. at 3-4  Marchisotto argues that the law permits, and public policy supports, a plaintiff to maintain a retaliation claim based on a complaint made in good faith even if the plaintiff fails to show that the complained of actions by the employer violated

Title VII.  **Id**.  As to the jury confusion argument put forth by the City and Hollywood, Marchisotto argues that the verdict form did not clearly state that the jury was to stop answering the questions if they answered in the negative, but rather used the more ambiguous language "deliberations are finished."  **Id**. at 4.  In addition, Marchisotto argues that the jury's answers actually demonstrated their complete understanding of the concept that "conduct not rising to the level of actionable sexual harassment may still affect an [employee] and cause him to make a good faith complaint."  **Id**.  Marchisotto also claims that granting the motion for judgment as a matter of law on the basis of the verdict form would be inappropriate because it was the charge where no liability was found that had an allegedly improper form, not the charge where liability was found.  **Id**.

    As to the City and Hollywood's first argument, that the verdict was against the weight of the evidence, they fail to demonstrate either that there was no evidence supporting the jury's verdict, or the evidence in their favor was such that no reasonable jury could have found against them.  ***See* Galdieri-Ambrosini**, 136 F.3d at 289; **Luciano**, 110 F.3d at 214; **Cruz**, 34 F.3d at 1154.  The City and Hollywood argue that no reasonable jury could have found that Marchisotto had a good faith basis to complain about sexual harassment.  Def. Mem. at 5.  However, whether or not Marchisotto had a good faith basis is, to a large degree, a credibility determination. Marchisotto testified about several instances that he believed to be sexual harassment, and that it was this belief that caused him to make his complaints.  While Hollywood testified that the instances of harassment never took place, the jury had an opportunity to consider this conflicting testimony in their deliberations.  They found that Marchisotto did have a good faith basis, and the Court, of course, must defer to the jury's credibility determinations.

The City and Hollywood's second argument, that the failure to follow directions on the verdict sheet requires the retaliation verdict to be set aside, also fails. They fail to elaborate on why the alleged failure to follow directions raises such "serious doubts" as to whether the jury followed the Court's instructions, nor do they explain why these "serious doubts" only call into question the jury verdict that went against them and not both verdicts. These bare allegations, without more, do not meet the burden required for a judgment as a matter of law.

Finally, the argument that, "to the extent the jury found no *quid pro quo* sexual harassment, judgment should be entered for defendants on the retaliation claim," incorrectly states the law. The Second Circuit has held repeatedly that "[t]o prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII." **Manoharan v. Columbia Univ. College of Physicians and Surgeons**, 842 F.2d 590, 593 (2d Cir. 1988); *see also* **Reed v. A.W. Lawrence & Co., Inc.**, 95 F.3d 1170, 1178 (2d Cir. 1996); **Quinn v. Green Tree Credit Corp.**, 159 F.3d 759, 769 (2d Cir. 1998); **Wimmer v. Suffolk County Police Dep't**, 176 F.3d 125, 135-36 (2d Cir. 1999). Rather, to make out a prima facie case, "the plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" **Manoharan**, 842 F.2d at 593 (*quoting* **Abel v. Bonfanti**, 625 F. Supp. 263, 267 (S.D.N.Y. 1985)). Therefore, "it is possible for an employee to reasonably believe that specified conduct amounts to harassment, even when that conduct would not actually qualify as harassment under the law." **Quinn**, 159 F.3d at 769.

In their motion, the City and Hollywood do not claim that Marchisotto did not have a good faith belief that his complaints had resulted in an adverse employment action against him.

Instead, they assert that, because the jury did not find *quid pro quo* sexual harassment, it would be impossible "for the jury to then conclude that [Marchisotto] had a good faith basis to complain about sexual harassment." Def. Mem. at 5. Therefore, the issue before this Court is whether there was sufficient evidence to support the jury's finding that Marchisotto's good faith belief was reasonable. The City and Hollywood claim that the jury made a "factual finding" that the Marchisotto's allegations of behavior by Hollywood "simply did not happen." **Id**. They argue that the jury's verdict on the *quid pro quo* claim means that they did not believe Marchisotto's allegations, and, if they did not believe him, could not then find that he had a good faith basis to make a complaint. **Id**. These are not a reasonable inferences based on the jury's verdict. According to the verdict sheet, the jury found that Marchisotto did not prove by a preponderance of the evidence that he was subject to unwelcome sexual harassment by Hollywood. However, this does not mean that they disbelieved his allegations. The jury could have believed Marchisotto's testimony about Hollywood saying his evaluation "didn't have to go this way," but not found that Marchisotto proved by a preponderance of the evidence that his interpretation of the behavior as sexual harassment was the correct interpretation. Much of the behavior Marchisotto alleges took place could have been interpreted more than one way. In fact, the City and Hollywood offered an alternative explanation for the phone calls by Hollywood to Marchisotto that he interpreted in a sexual manner. The jury could have found that both explanations for the phone calls were reasonable, and that Marchisotto did not meet his burden in proving that they were sexual harassment. Assuming this was their finding, it would not be inconsistent for the jury to also find that Marchisotto had a good faith basis to complain. As discussed above, the record includes sufficient evidence to support the jury's finding that

Marchisotto had a good faith belief that the City and Hollywood had violated Title VII.  **_See_**

**Quinn**, 159 F.3d at 769.  The jury's verdict was neither irrational, nor, under the evidence

presented and the governing law, a verdict a reasonable jury could not have reached.  Therefore,

the City and Hollywood's motion is **DENIED**.

**B.      FRCP 59(a) Motion for a New Trial**

Under FRCP 59(a), ordinarily, a court should not grant a new trial "unless it is convinced

that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of

justice." **Smith**, 861 F.2d at 370.  Unlike a judgment as a matter of law, a new trial may be

granted under FRCP 59 even if substantial evidence exists to support the jury's verdict.  **_See_**

**Song v. Ives Lab., Inc.**, 957 F.2d 1041, 1047 (2d Cir. 1992).  Moreover, in considering a motion

for a new trial, a court "is free to weigh the evidence . . . and need not view it in the light most

favorable to the verdict winner." **Id**. (**_quoting_ Bevevino v. Saydjari**, 574 F.2d 676, 684 (2d Cir.

1978)); **_see also_ Bartniak v. Cushman & Wakefield, Inc.**, 223 F. Supp. 2d 524, 528 (S.D.N.Y.

2002).

The City and Hollywood argue that a new trial on the retaliation claim should be granted

because evidentiary rulings by the Court were in error. Def. Mem. at 9.  In support of their

motion for a new trial, the City and Hollywood argue that: 1) it was improper for the Court to

have permitted testimony or a jury charge on the removal of Marchisotto's firearms at his home;

2) testimony about Sergeant Napolitano's alleged misconduct should have been excluded; and 3)

in light of Marchisotto's summation, the preclusion of relevant testimony regarding his history

denied the City and Hollywood a fair trial. **Id**. at 6-9.

While the City and Hollywood move for a new trial pursuant to FRCP 59 based on

alleged evidentiary errors, they fail to put forth arguments based on the appropriate standard.  A

motion for a new trial based on evidentiary errors can only granted if the errors meet the standard

set in FRCP 61.  **Am. Nat'l Fire Ins. v. Mirasco, Inc.**, 451 F. Supp. 2d 576, 584-85 (S.D.N.Y.

2006) (*citing* **Perry v. Ethan Allen**, 115 F.3d 143, 150 (2d Cir. 1997)).  FRCP 61 states:

> No error in either the admission or the exclusion of evidence and no error or defect
> in any ruling or order or in anything done or omitted by the court or by any of the
> parties is ground for granting a new trial or for setting aside a verdict or for
> vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to
> take such action appears to the court inconsistent with substantial justice.  The
> court at every stage of the proceeding must disregard any error or defect in the
> proceeding which does not affect the substantial rights of the parties.

FED. R. CIV. P. 61.  A substantial right will only be found to have been affected "where a jury's

judgment was likely to have been 'swayed by the error.'"  **Am. Nat'l Fire Ins.**, 451 F. Supp. 2d at

585 (*citing* **Parish v. Sollecito**, 280 F. Supp. 2d 145, 165 (S.D.N.Y. 2003)).

The City and Hollywood object to the inclusion of testimony about the removal of

Marchisotto's firearms at his home on the grounds that it was irrelevant, inflamatory, and

prejudicial, and to the testimony regarding Sergeant Napolitano's alleged misconduct on the

grounds that it was irrelevant and prejudicial.  Def. Mem. at 6-7.  However, they do not claim

that their substantial rights have been affected by the allegedly erroneous inclusion of this

evidence, nor do they attempt to show that the jury was swayed by this information.  Moreover,

this Court does not find either of these rulings to have been in error.  Testimony regarding the

removal of Marchisotto's firearms was relevant as evidence of retaliation, and there was

sufficient evidence introduced to support Marchisotto's contention that he had complained

verbally prior to the removal of his firearms and that Hollywood and others were aware of these

complaints.  While the removal of the firearms occurred on February 17 and Marchisotto's first

written complaint alleging sexual harassment did not occur until February 25, Marchisotto

testified that he complained verbally to other members of the NYPD.  Tr. at 90, 105, 127-28.

Though none of these complaints were made directly to any of his supervisors, Hollywood and

Captain Gutch both testified that they were told of numerous complaints, threats, and other

behavior of Marchisotto without any written complaints or first-hand knowledge.  Based on the

picture painted by Hollywood and Captain Gutch of an environment where news spreads quickly

and by word of mouth, it was not unreasonable to allow the testimony on the basis that the jury

might discredit Hollywood and Captain Gutch's testimony that they did not know about the

sexual harassment allegations until they were made aware of them by a newspaper reporter in late

March 2004, and instead find it likely that they learned of them much earlier.  The City and

Hollywood maintain that the testimony concerning Sergeant Napolitano was prejudicial, but do

not explain how it prejudiced them.  This Court agrees with Marchisotto that the testimony about

Sergeant Napolitano was helpful to the jury in understanding the chronology of events, and does

not find the ruling to be erroneous or the admission of the information prejudicial.  Pl. Mem. at 5.

The City and Hollywood's argument that there was not sufficient evidence for the jury to

consider Marchisotto's claim that the removal of his firearm was retaliation for his complaints

also fails.  They allege that the inclusion of the firearm removal as one of the potential methods

of retaliation in the jury charge was erroneous, and should give rise to a new trial under FRCP

59, because Marchisottto failed to make out this claim at trial.  Def. Mem. at 6.  "'A jury

instruction is erroneous if it misleads the jury as to the correct legal standard or does not

adequately inform the jury on the law.'"  **Perry v. Ethan Allen, Inc.,** 115 F.3d 143, 153 (2d Cir.

1997) (*quoting* **Anderson v. Branen**, 17 F.3d 552, 556 (2d Cir. 1994)).  However, a party is not

entitled to an instruction, even if proper, "for which there is no evidentiary predicate at trial."

**Id**., (*citing* **Gadaleta v.Nederlandsch-Amerekaansche Stoomvart**, 291 F.2d 212, 214 (2d Cir.

1961)).  As stated above, the Court finds that there was sufficient evidence presented such that a

jury could reasonably conclude that Marchisotto complained about the alleged sexual

harrassment prior to the date on which his firearms were removed.

Finally, the City and Hollywood argue that the Court's exclusion of evidence purportedly

showing that Marchisotto had made past complaints about his supervisors following poor

evaluations and disciplinary actions.  Def. Mem. at 7-8.  They argue that the evidence should not

have been precluded pursuant to Federal Rule of Evidence 403, as it was not more prejudicial

than probative.  **Id**. at 8.  According to the City and Hollywood, this error was exacerbated by

Marchisotto's summation, in which his counsel stated that, ". . . I think you can make the

inference, he had supervisors.  He had supervisors in his career.  This wasn't the first supervisor

he met in October when . . ."  Tr. at 361.  They claim the evidentiary ruling, in conjunction with

plaintiff's counsel's statement, "created a double standard precluding probative testimony from

defendants' witnesses while allowing prejudicial comment from plaintiff's counsel."  Def. Mem.

at 8.  Marchisotto asserts that the evidence was properly excluded, and his comment was in

response to the City and Hollywood's contention that Marchisotto had never been under direct

supervision.  Pl. Mem. at 6-7.

The Court finds that its rulings on both the evidence and the summation statement were

proper.  As to either challenge, the City and Hollywood have not demonstrated how these rulings

either affected their substantial rights or swayed the jury.  **Am. Nat'l Fire Ins.**, 451 F. Supp. 2d

at 585 (*internal citations omitted*).  While the Court accepts the interpretation of Marchisotto's

statement that he claims he intended, even if the jury had interpreted the statement in the manner suggested by the City and Hollywood, the error would not support the granting of a new trial.  It is only when an attorney's summation "deprived the opposite party of a fair trial" that the moving party is entitled to a new trial.  **Mileski v. Long Island R.R., Co.**, 499 F.2d 1169 (2d Cir. 1974). That was not the case here.  The City and Hollywood can only point to one objectionable comment in the whole summation, and there is no evidence that the comment was interpreted in the manner they assert.  Whether or not that one comment supports a motion for a new trial is "within the broad discretion of the trial court," and the Court finds that it does not.  **Parrish v. Sollecito**, 280 F. Supp. 2d 145, 168 (S.D.N.Y. 2003) (*internal citations omitted*).

None of the arguments put forth by the City and Hollywood on behalf of their motion for a new trial pursuant to FRCP 59(a) convince this Court that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  **Smith**, 861 F.2d at 370. Therefore, the motion for a new trial is **DENIED**.

**C.     FRCP 59(a) Motion for New Trial on Damages or, in the alternative, Motion to Reduce the Jury Award Pursuant to FRCP 59(e)**

In their motion, the City and Hollywood move for a new trial on liability and damages or, in the alternative, for the Court to reduce the jury award, either by amending the judgment or ordering remittur.  Def. Mem. at 9.   As discussed above, under FRCP 59(a), the Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," **Smith**, 861 F.2d at 370, and, therefore, the defendants' motion for a new trial on liability is **DENIED**.

Arguing that the jury's verdict is excessive and that the jury based the award on more

than the emotional damages flowing from the retaliatory acts, the City and Hollywood also ask the Court to order a new trial on "damages, or remit the award to an amount that would not be excessive."  Def. Mem. at 10, 14.  Marchisotto claims that the jury's award is "within a reasonable range," supported by medical testimony, and should not be disturbed.  Pl. Mem. at 7-9.  The "calculation of damages is the province of the jury," **Ismail v. Cohen**, 899 F.2d 183, 186 (2d Cir. 1990), and such an award should only be overturned if it "shock[s] the judicial conscience and consitute[s] a denial of justice."  **O'Neill v. Krzeminski**, 839 F.2d 9, 13 (2d Cir. 1988).  In deciding whether a particular verdict meets this standard, courts should look to other cases involving similar facts, but with the caveat that each case presents "'a unique set of facts and circumstances.'"  **Scala v. Moore McCormack Lines, Inc.**, 985 F.2d 680, 684 (2d Cir. 1993) (*quoting* **Nairn v. Nat'l R.R. Passenger Corp.**, 837 F.2d 565, 568 (2d Cir. 1988)).

The City and Hollywood assert that jury verdicts exceeding $100,000 have been warranted only in egregious cases, such as where the conduct was outrageous, the plaintiff's physical health was significantly affected, the conduct caused such stress that it lead to severe emotional or physical reactions, or the plaintiff experienced debilitating and permanent alterations in lifestyle.  Def. Mem. at 13.  They claim that Marchisotto produced no evidence of any of the above, and, therefore, his case did not rise to the level of egregious.  **Id**.  Moreover, they argue that he was not subjected to the retaliatory act of assignment to the record room for long because of sick leave and a physical injury which lead to his retirement, both of which they claim were "unrelated to his emotional distress claim."  **Id**. at 11.  However, the City and Hollywood are factually incorrect on two points.  First, they claim that Marchisotto was assigned to the record room in March 2004, and then out on leave for two weeks in March 2004 and then

17

from April 2004 to July 2004, after which he retired.  **Id**.  This rendition of the testimony would

give the impression that Marchisotto was only in the record room for approximately two weeks,

from mid March 2004 to April 2004.  However, Marchisotto actually testified that he was

assigned to the record room from March 3, 2004, through August 23, 2005, which would be

approximately eighteen (18) months.  Tr. at 69.  During those eighteen months, Marchisotto was

out sick for the first two weeks of March 2004, and then out for two (2) to three (3) months

because of surgery.  **Id**. at 71.  Therefore, the testimony established that, at a minimum,

Marchisotto spent about fourteen months in the record room.  Second, the City and Hollywood

claim that these absences are not related to Marchisotto's claim of emotional distress.  Def. Mem.

at 11.  However, Marchisotto's two week absence in March 2004, was directly related to his

emotional damages claim because it was the result of a panic attack he had, which he attributed

to his assignment to the record room.  Tr. at 65.

 In spite of the City and Hollywood's claims to the contrary, Marchisotto did present

evidence that his "physical health . . . was significantly affected."  **Rainone v. Potter**, 388 F.

Supp. 2d 120, 123 (E.D.N.Y. 2005).  Marchisotto testified himself that he felt depressed,

demeaned, and humiliated, and that he sought medical help starting in December 2004, and was

still receiving medical care at the time of trial.  **Id**. at 78, 79-82.  Marchisotto was prescribed

medication to treat anxiety, depression, the inability to perform sexually, and insomnia, and Dr.

Conciatori testified that he is still taking medication for anxiety, depression, and sleeplessness.

**Id**. at 80, 230.  Dr. Conciatori diagnosed Marchisotto as suffering from panic disorder,

posttraumatic stress disorder, and major depressive disorder, and Dr. Pompo corroborated the

diagnoses of posttraumatic stress disorder and major depressive disorder.  **Id**. at 226, 257.  There

was evidence presented that Marchisotto experienced both physical and emotional symptoms, notably flashbacks, problems sleeping, anxiety, humiliation, difficulty performing sexually, sadness, apathy, lack of concentration, changes in appetite, and significant distress.  **Id**. at 228-30, 247.  While Dr. Pompo indicated there was some improvement in Marchisotto's condition by the time of trial, there was ample testimony that Marchisotto was still suffering from the effects of the retaliation.  **Id**. at 230, 257-58.  Marchisotto was described as "shattered," and unable to move on with his life.  **Id**. at 230, 258.  This uncontroverted evidence that Marchisotto suffered significant physical and emotional stress, which altered his lifestyle and continues to affect him today, defeats the City and Hollywood's near baseless assertion that the jury's verdict was "excessive as a matter of law."  Def. Mem. at 13.

The City and Hollywood also object to the verdict on the basis that the jury "wrongfully considered" "other emotional factors causing . . . distress."  **Id**. at 14.  In support of this claim, they advance three arguments: 1) the evidence demonstrates that the emotional distress Marchisotto suffered was caused by factors other than the retaliation; 2) the size of the verdict indicates that the jury ignored the Court's instruction to award damages only for emotional distress; and 3) there was no evidence presented that Marchisotto's assignment to the record room is the reason that he can no longer work as a police officer.  **Id**.  at 14-16.  All three of these arguments fail for lack of any substantial support in the record.  First, the City and Hollywood claim that there was testimony by Marchisotto and his treating physicians that there were "numerous events and . . . factors" apart from the retaliation that caused Marchisotto to suffer from major depressive disorder and posttraumatic stress disorder.  **Id**. at 14.  These other sources of strain that the City and Hollywood cite are Marchisotto's "constant involvement in

litigation," his injury to his finger, and anonymous death threats he received from other officers, all of which they assert are unrelated to the retaliation. **Id**. at 15.  As to the first cause, involvement in litigation, the record does not support the assertion that the litigation causing stress was unrelated to the retaliation claim.  In fact, in support of their assertion the City and Hollywood cite testimony by Dr. Conciatori in which he discusses how the litigation of the retaliation claim "exacerbated his symptoms," and was "like a wound that kept being picked on and opening up again."  **Id**. at 15; Tr. at 229.  It cannot be said that itigation of the retaliation claim was unrelated to the City and Hollywood's conduct.  As to the second two causes, the finger injury and death threats, there is no support in the record for the claim that these events factored significantly into Marchisotto's psychiatric conditions.  Marchisotto experienced a panic attack on his first day in the record room, long before his finger injury, and both of the treating physicians focused on his experiences in the record room as the source of his flashbacks, depression, anxiety, and other symptoms.  Tr. at 225-26, 228-231, 252, 254, 256-58.  In **McGrory v. City of New York**, which the City and Hollywood cite for support for their position, the testimony by the plaintiff's doctor and wife "attributed most, if not all, of McGrory's extensive psychological problems to events for which the City cannot be held liable." 2004 WL 2290898, at *15 (S.D.N.Y. Oct. 8, 2004).  However, in the instant case, the scant testimony about the physical injury and the death threats is far outweighed by the extensive testimony attributing Marchisotto's emotional injuries to the retaliatory act.

The City and Hollywood's second and third objections to the verdict can also be dismissed as lacking merit.  The jury instructions clearly addressed what could compose compensatory damages, stating, "[t]he type of compensatory damages available in this case is

compensation for mental anguish, pain and suffering, humiliation, indignity and embarrassment." Tr. at 390.  When discussing how to reach a determination on an amount, the Court further instructed, "For example, compensatory damages are available for emotional distress and humiliation.  It is difficult to arrive at a precise evaluation of the actual damages for emotional harm." **Id**. at 391.  Nowhere in the instructions was it implied that the jury should interpret compensatory damages as encompassing anything more than the above mentioned elements, and no reason to believe that they did.  While the City and Hollywood may find the size of the jury verdict objectionable, there is no support in the record for their conjecture that the jury considered factors other than those on which the Court instructed them.

        The final issue facing this Court is whether the jury's verdict is comparable to awards in other cases.  **Scala**, 985 F.3d 680, 684 (2d Cir. 1993) (***internal citations omitted***).  Here, the jury found that the City and Hollywood retaliated against Marchisotto for his complaints about sexual harassment.  Marchisotto's guns were removed, and he was assigned to a record room with no responsibilities whatsoever for approximately eighteen (18) months.  His assignment ended only when he retired, not because the retaliatory actions were terminated by defendants.  It is reasonable that, given the ample evidence of Marchisotto's severe emotional injuries, and the altering impact on his lifestyle and daily routine, presented at trial, the jury found that $300,000 was the appropriate amount to compensate him for his injuries.  Moreover, Marchisotto was continuing to receive medical care with only moderate improvement in his condition.  Given this uncontroverted testimony, the jury's verdict is not so generous in light of comparable cases to find it excessive and warranting either a new trial or remittur.  ***See, e.g.,*** **Osorno v. Source Enterprises, Inc.**, 2007 WL 683985, at *5 (S.D.N.Y. Mar. 2, 2007) (finding an award of $4

million for emotional distress to be reasonable based on plaintiff's testimony about her depression, anxiety, and embarrassment); **Petrovits v. New York City Transit Auth.**, 2003 WL 22349676, at * (S.D.N.Y. Oct. 15, 2003) (award of $150,000 in compensatory damages is not excessive where plaintiff sought mental health treatment for stress from denial of promotion); **McDonough v. City of Quincy**, 452 F.3d 8, 22 (1st Cir. 2006) (upholding compensatory damages award of $300,000 where bulk of award was for emotional damages and plaintiff testified that he had loved his job, suffered humiliation, and his relationship with his family suffered because of his anger); **Moorer v. Baptist Memorial Health Care System**, 398 F.3d 469 485-86 (6th Cir. 2005) (finding award of $250,000 for emotional damages reasonable when plaintiff and his physician testified that he suffered from depression, loss of self-esteem, anxiety, and "excessive thoughts"). Finding the arguments put forth by the City and Hollywood in support of their motion for a new trial on damages or a reduction in the verdict to be without merit, the motion is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the City and Hollywood's motion for dismissal of, or a new trial on, the retaliation claim, or for a new trial on damages, or, in the alternative, to reduce the jury's award is **DENIED**, and judgment shall be entered for Marchisotto against the City of New York in the amount of $300,000.

**SO ORDERED this 11th day of April 2007**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**